Okay, we'll call the next case Remington Lodging v. NLRB. We'll hear first from Mr. My name is Carl Terrell. I'm here on behalf of the petitioner for review, Remington Lodging and Hospitality. Remington Lodging and Hospitality manages, operates a hotel in Long Island. It acquired the hotel in December of 2011. At that time, the housekeeping department was staffed by an outside staffing company. The company took the employees in-house at that point, and on June 28, 2012, the president of the company, based in Dallas, in consultation with two of his top executives, were extremely concerned about the guest satisfaction scores, which is a very serious problem for a company like this. And particularly, they were very concerned about the guest satisfaction scores in the housekeeping department, which had dropped to a 20 on a scale where the brand average, the Hyatt brand average, was 50. And in April, it stood at 20, and then it dropped into the single digits in May, June, July, and August for each month. The problem came to their attention in June, and the decision was made to once again outsource the staffing of this department. Well, counsel, obviously NLRB knew that. My understanding of the IJA initial decision and the board is that the timing of this remains, allows the opposite finding to be made, that you had been in operation for whatever number of months, that is, 6, 7, 8, and you were going back to a situation, using this outside outsourced situation that had been just as bad, with just as low ratings, before it was taken in-house, and so you were going back to a bad situation. And so it just, you know, an awful lot of your hurdle here is that we're looking at fact-finding, not necessarily what we would find, but what in fact was beyond the pale for the board to find. What do you do with the timing issue? I know you dispute when the company would have first been aware of any kind of unionizing, and the fact that you were going back to a failed system. Well, the hotel of the company had only come into the property in December of 2011, and the real problem, the nature of the problem, was the ability to staff, HSS to staff, to obtain employees to work in the hotel. There's testimony recited in our brief by the director of housekeeping that she was understaffed, she was having to have her workers clean 16 and 17 rooms rather than the standard 15, and they were working overtime. That was the nature of the problem. They couldn't get the staff. And HSS, which did have a track record in the area, had an office and served several hotels at one point in the past, had the ability to do this. And so Remington reasonably believed that they could solve this problem. And they were also looking at fact-finding, and it's almost like the previous case, is it overwhelming evidence in favor of you. Another matter consistent with the point you were just making is that HHS, if that's the right acronym, no longer had an office on Long Island, and they were not a very good prospect for being able to improve your manpower, if that's probably not quite the right word here, problem. HSS knew the area, had experience in the area, they knew where the workers were, they knew the resources. In any event, they sold Remington on their ability to do what they had done in the past, and Remington had only had a short interaction with them at the very beginning. Remington's normal business model is to bring all employees in-house. Yet, in addition, on occasion, it's commonplace in the industry to use staffing sources like HSS. The other component here is Remington talked to two or three members of the housekeeping staff around this time about union organizing activities. So, I mean, wouldn't you agree that the fact-finder was entitled to find that Remington was aware that organizational efforts were being made with the housekeeping staff? There was suspicion at most, and the board only relied on a finding of suspicion. There was no showing, and the judge, the administrative law judge, who was affirmed on this point by the board, came up with no evidence that Remington knew that its employees were actively involved or engaged in union activity. At most, they had a suspicion that there might be someone out there. The board, in its finding that the right-line element of employer knowledge pointed to only two interrogations, and those interrogations yielded nothing in terms of knowledge of employee involvement in union activity. And, in fact, we know from the rest of the record that the first meeting that the union ever had with any employees was not until July 4th, and there were no card signatures before that. We've also pointed out in our brief the very limited, secretive nature of the union organizing activity that was going on. Mr. Terrell, there was evidence that you dispute and some merit to the concern that you raise that initially there was testimony, the particular meeting occurred after the decision in June was made, but then in a follow-up statement, I don't remember the two women involved, but a supervisor and someone else who actually had the union card of the organizer changed the time, and I'm probably conflating two different stories, but at some point, there was evidence on the table that could be accepted by a fact finder that the company did become aware in June of organizing activity. Most of the— You didn't like that evidence, meaning you don't think it's very plausible, but that I don't believe that evidence occurred before June 28th when the decision was made, and there was really no knowledge of employee activity until the petition was filed, and the petition was filed after HSS came on board. Well, but at least, I mean, looking at this from the board's viewpoint, the fact finder viewpoint that we have to accept absent another hurdle that has to be reached is that there was evidence that the union was at least trying prior to this decision being made to outsource. Is that a fair statement, that there is some evidence of that? That is, in fact, how the board framed it, that the company had a suspicion. I'm not following. Say again. The company had a suspicion that there was. So I think that's a fair statement in light of the court's—the board's actual holding that the company had at least a suspicion. But we turn to the next element, and that is the element of under the right line test, even with this minimal amount of knowledge, this suspicion, did the company take an action that it would have done in the absence of union knowledge? And here is where the evidence is extremely clear, given the serious problem that had to be addressed and that was decided on early on. In addition, under Section 8A3, which is the actionable section there, 29158A3, as the Supreme Court has held in 1965 in American Shipbuilding versus NLRB, under the words of the statute, 8A3, there must be discrimination and resulting discouragement of union membership. And the facts here do not point to that whatsoever, Your Honor, and I respectfully direct you to the following facts. When Remington, after negotiating the contract with HSS, Remington's direction to HSS was to hire all of the employees. They wanted to keep the employees they had, and they were looking to HSS to bring new employees in. The only reason that some of those employees were not hired by HSS was by HSS's independent action of applying the routine screening, drug testing, E-Verify. But Remington's direction, as is undisputed in the record, was to hire all of the employees. Remington, in addition, remained the employer, became a joint employer. The director of housekeeping remained on board with Remington, and the two supervisors remained on board. The employees didn't necessarily know that, though, did they? From their perspective, the only thing that changed was the name on the paycheck, the payor on the paycheck. They kept the same job. They reported to the same supervisors and at the same location. Everything was the same. However, the petition was filed after HSS came aboard, and the petition named Remington as the employer. A couple of weeks later, the union amended the petition to show both Remington and HSS as the employer. Didn't the employees, didn't they have the impression that the housekeeping was being They kept the same supervisors. They did the same job. Didn't they think that it had been shifted over to a different company? They knew that they had a new employer, and they did have to fill out a new application, and some were not hired because they failed E-Verify or drug testing. But beyond that, it was the same job. They actually earned a little bit more money through the negotiations, HSS convinced Remington that they had to raise the rates in order to bring staff in. It seems like the point is, it's one thing to say in hindsight, there's evidence there that they would have known it's the same employer, or two employers now, but no one told them that, that I understand is in the record. They were never told either way, we're still staying the employer, but HHS is going to be involved as well. There's nothing like that in the record, is there, that they were explicitly told it's the same employer. So what we're looking at, is there enough there for each of the employees that they should have known it's the same employer? Well, I wouldn't expect that the employees made fine legal distinctions and were conversant with the joint employer theory, but they were doing the same job with the same supervisors. The ramifications you want us to draw from the fact that it's the same employer do seem to require that the employees had knowledge. If you can convince me otherwise, but isn't it important, if your point about Remington still being the joint employer, doesn't that require that the employees actually have known that as well? Well, and I think it's reasonable to assume that they did. The union amended the petition one week later to name both Remington and HHS, and it's easy to assume, it's certainly reasonable to expect that they would have explained to the employee, hey, Remington is still your employer, HHS is now in here too, we're going forward on this petition with both entities as your employer. So there are two sets of employees at issue here that were transferred to HHS on August 20 of 2012. Those that were not hired because they did not pass the screening that HHS independently imposed, and the others. It's hard to reach the conclusion from the employee's perspective of what was happening that any action discouraged union membership. Just because HSS came in, Remington was still there, the job was still the same, it's hard to take from that that the employees would have been discouraged in union membership. It was the essential element in the statute. And nothing changed. With respect to those employees who were not hired by HSS, that was due entirely to the independent action of HSS. The board nonetheless found liability with respect to those employees, the ones who were not hired by HSS through a chain of causation logic. But the analysis really should end at the point when Remington said, hire all of our employees, we want you to hire all of our employees. Independent of that, HSS made the decision to apply its normal screening measures and as a result of that, those employees lost their job. But those employees did not lose their job because of union animus. They lost their job because HSS independently imposed the screening criteria. With respect to the employees who stayed and who continue to do the same job, it's hard to infer from the record that those employees would have been discouraged in union membership. Why is it reasonable to say that after they find out that HSS is their new employer, that the employers play in a pea and shell game. We've got this union progress we're making to get organized under Remington and now we've got to start all over. They didn't have to start all over. I know, but why wouldn't they have that impression? Well, I think the facts speak for themselves in that after HSS came in, the petition was filed and then another one was filed naming them both and then they amended two more times and they amended to add additional bargaining units or additional groups of employees and departments within the hotel. It did not discourage union membership. Those facts speak loud and clear. Whatever happened from the record, however you conclude what the record shows, it did not discourage union membership. Can I ask you to address the Loya Kano situation? Oh, I'm sorry. Ms. Loya Kano was not engaged in protected activity at the time. She was also known. She was not perceived as a pro-union supporter and it was a legitimate discipline. The discipline was consistent with two employees engaged in similar conduct. As the dissent correctly stated, because there was no concerted activity, a violation cannot be found. And in our brief and in the dissenting opinion, the cases relied upon by the board were distinguished. Bottom line, there was no concerted activity on her part. She was not pro-union. She was legitimately terminated. I see my time is up. If the presider would allow me, I have one procedural question to ask you about this and I wish the board would address it as well. The ALJ found that her discharge violated 8A1 but did not violate 8A3, I think. So does right line definitely apply? Is that burden shifting I thought was traditionally for 8A3, is it been held that applies to 8A1? If that's not something you've considered, you don't have to wing it. Is there any law on that that you know of? You're correct. That right line does apply to 8A3. And it is my understanding that this was only found to be an 8A1 violation. And because there was no concern, because Ms. Loacana was not engaged in concerted activity, I think the 8A1 violation must fall, must be reversed. Thank you. Thank you, sir. Mr. Casserly. Good afternoon. You may please report. My name is David Casserly representing the National Labor Relations Board. I'd like to start by answering Judge Southwick's question at the end of Remington's presentation, and that's that. The answer is yes. Right line does apply to 8A1 violations in general if the issue is an employer's motivation. The board generally, so the great majority of 8A1 violations don't involve an issue of motivation. The issue is whether a particular activity was protected and concerted. But if the employer brings up an alternative motivation, if it's clear that this was protected concerted activity, but the employer sets forth a different motivation, then the board uses right line to evaluate that. I'm not aware off the top of my head of any of this Court's cases that apply a concerted activity 8A1 right line analysis, flex frac logistics might, but it's a regular thing that the board certainly does. You don't claim that she was involved in a concerted effort for the union activity, though, do you? No, Your Honor. It's undisputed that her activities were not concerted in that she had not actually spoken with any other employees or discussed her activities ahead of time. That said, what is not undisputed is whether Remington thought that her activities were concerted. If you look at the email attached to her discharge letter, the company mentions in several places, it's the supervisor, Ms. Borrero, who mentions in several places that she had been talking about whether she might discuss with this other employee, Ken, before bringing her concerns again to manager Jeff Rostick. And these are concerns about Remington's anti-union materials. This is a pie chart they distributed as part of their response to the unionization campaign that Ms. Locano was criticizing. Counsel, it seems to me that some of your points will go beyond this, but I found not as convincing as some parts of the board decision. Making a distinction, Remington did have two other examples of individuals who had this hostess or whatever it is position who, when they disappeared at the wrong time, were in fact fired. Now, the distinction made was those two were talking to each other and they were both fired at the same time about sports, where she had gone to some other part of the hotel to talk about pie charts. I don't find that useful. In all three situations, they were unavailable to do their job at a, I don't know about the other two, but certainly this woman at a key time when she was needed near the front desk or in the lobby. Is that, what do you make of that distinction? Is that really valid that's in the board decision? Yes, Your Honor. And as to those two employees, first of all, only one of them was discharged. The other one was given a warning and then quit. They were speaking to each other? They were speaking to each other. Yes, one of them was discharged and the other one was given a warning and then that other employee quit. Other important considerations are those two employees were talking to each other about a sports conversation when there were actually customers present waiting to be helped who were being ignored because they wanted to be talking with each other. Here, there's no evidence that there were actually any customers who were looking for Ms. Locano while she was talking to Ms. Barrero. Second of all, she was speaking with a supervisor during these 10 to 15 minutes and at no point during that conversation did Ms. Barrero tell her that she needed to return to her post or that she was doing anything wrong by remaining away from her post. And that also distinguishes it from the other two employees who had been speaking with each other. It stands to reason that if she was speaking with a supervisor who did not mind that she was doing that and didn't give any indication that she needed to return to her post, that perhaps it was really the content of the conversation that was the issue, not the fact that she was gone from her post for 10 to 15 minutes. Then finally, it's also clear from the record that this lobby ambassador position is not one that's always present at all in the hotel. There's only two of them on duty, the other one being the employee named Ken. And so this is a hotel that's open 24-7. They sometimes even send the on-duty lobby ambassador off to do other things such as drive the company van. So it's not entirely clear that it's really that important, so important that an employee be at her workstation at all times. They said so afterwards. The indication was this was at a peak time, though. Yes, Your Honor, that's the testimony. But again, there's nothing other than the post-talk testimony to say that this was a peak time and that it's important. There's nothing in her job description that says you will be in the hotel at this particular time or that any particular peak time is more important than another. Well, it makes sense, though, doesn't it? If you've got a lot of people, it's a time when a lot of people are coming in and checking out that you need that. That's the reason she's there. Yes, Your Honor, it does make some intuitive sense. But under a substantial evidence standard, the Board found that there was not enough to show, keeping in mind that under the right-line standard the burden of proof is on Remington here, the Board found that just that kind of common sense that they would want her in the lobby is not really enough to overcome the finding that they discharged her for a different reason. If the Court has no further questions on her discharge, I'll move on to the subcontracting. So, first of all, one thing that has gone unmentioned so far is that immediately after the subcontracting, on the very day that it took effect, August 21, 2012, Supervisor Perceda-Rosero told an employee, a housekeeper, that it was done because of the union. The judge found this as a fact. The Board found this as a fact. The Board then relied on that fact and stated that there's no reason to believe that Ms. Rosero was lying, that there's no evidence of fabrication, and it therefore found that that was evidence that they did so for that reason. Remington has not challenged that finding or even mentioned it in this appeal. Nowhere in their brief do they discuss that. They do not challenge the fact that Ms. Rosero's statements as part of that conversation with employee Maritza Torres violated Section 8A1. And under a substantial evidence standard, an employee, sorry, a supervisor stating that this was the reason and the Board therefore then adopting that with no challenge is enough to show that that was indeed the reason. Even aside from that, the Board went on and discussed several other points, and one of them about on to whether Remington, when Remington knew of union organization. The Remington mentioned during argument that there were two interrogations that the Board found for sure that only two had happened before June 28th and that neither of them yielded any information about unionization. And while that might be true, the questions themselves show that Remington clearly knew that there was specific union organizing among its housekeeping employees. For instance, in the May conversation, Rosero asked an employee if she was going to an upcoming union meeting, and this would have happened just about very shortly after when the first union meeting was initially scheduled. So it certainly stands to reason that she would have known that actually there was a union meeting that had been scheduled, even if the employee didn't then volunteer any more information about that. You said May. There was actually that kind of encounter in May. I thought June was the beginning of any kind of discussions with employees, interrogations. Your Honor, the judge found that this conversation happened in late May, the administrative law judge did, and the Board adopted it. The witness who initially said it happened many months later? No, Your Honor. This witness gave several different dates, but they were all, one of them was in early June and the others were in May. So she said, she's the one who said it was a couple of days before her son's graduation, which turns out was at the end of May. And then at another point, she said it was about a month before her son's graduation. The ALJ didn't really resolve that difference. He found that it was sometime in May and didn't specify beyond that, and the Board adopted that finding. Do you accept that—I thought there was a pause there. I didn't mean to interrupt you. Do you accept, though, that the Board must—there must be a finding that the company did know of union activity? Yes, Your Honor, and there was. A finding that the company did know or suspect, you know, it's not—suspicion is enough for knowledge if that's still what ends up motivating it. But the Board found both here. It's not just a suspicion of general union activity. The Board found specific knowledge of the union activities of its housekeepers. What I want to make sure about is that the Board wasn't taking a position that it might have been going on, and that's enough reason. That's sort of animus against unions, even if it's not occurring. If that was the motivation, that would still be a violation of 8A1 or 8A3? Yes, Your Honor. The Board does—that is a position that the Board takes. Again, I don't think that's necessary to get there here because there was actual knowledge of union activity. What led the company to that knowledge? Is that in the record? Yes, Your Honor. I believe the conversation between Rosero and Housekeeper Moritza. That's what precipitated the interview. No, Your Honor. It's not clear how Proceeder Rosero found out about this. There was a union organizer directly going and speaking with employees, and it's not—he may not have known who all the supervisors were, but that's speculation. It's not clear. Ms. Rosero didn't testify, so nobody asked that question of her. If the Court has no further questions on knowledge, moving on to the encourage or discourage point, I do want to point out that although the dissent mentioned that issue, it was something the dissent brought up on its own. Remington did not bring this to the Board's attention. It didn't mention it in its exceptions to the Board, and, indeed, the encourage or discourage analysis is something that predates right line. All of the cases cited by the dissent predate right line. Generally, the Board will find that if there's an adverse action against employees, there doesn't need to be any further evidence of specific encouragement or discouragement, and the Board has steadily found that for now more than almost 40 years. So the fact that this was not brought up, this would, requiring that kind of evidence, would really require a C change in Board law, and not bringing that up to the Board is fatal in these circumstances. Sotomayor, explain it to me again. What would be the C change? The C change would be instead of having the right line analysis, which is if there's an adverse action motivated by union, anti-union conduct, that's enough to violate Section 883. You would also need a separate element to show that union conduct was actually encouraged or discouraged as a result of that adverse action. And that, the Board simply doesn't require that. Even if it did here. Is there any circuit law on that? Your Honor, I don't believe there's any circuit law post right line, none that I found in a quick look of any circuit law post right line that doesn't encourage or discourage analysis specifically. So, yeah. And as to whether employees were actually encouraged or discouraging, I mean, that's actually a counterfactual. It's really difficult to determine whether union organizing would have been more successful or less successful absent this subcontracting. The very fact that Remington remained a joint employer is somewhat immaterial. Nobody knew that at the time. It's not just that the employees themselves didn't know. They weren't told by Remington or anybody. But nobody actually knew for sure that they would be joint employers. This wasn't found until the judge's decision in May 2013. That's the first finding the Board made that these two entities were joint employers. And as far as it's not even clear in the record that Remington intended to remain a joint employer, there's record evidence and testimony from Rostec and a couple others that HSS intended to hire two separate housing supervisors that would be under HSS's control. And it's totally not clear whether that would be enough to defeat a joint employer finding. But the fact that that didn't happen isn't something that Remington could have known before the subcontracting happened. Why would it be discouraging to the employees in their union organizational activity when they found out that a new entity was going to be doing the housekeeping? Well, in two ways, Your Honor. First of all, what actually happened when they found out and what employees testified happened was that they told they had lost their jobs, they were not employed by Remington, and they were told that they would have to be rehired by HSS. Now, HSS had made a commitment to rehire them if they passed certain background checks, but employees did have to reapply for their own jobs again. And some number of employees, it's unclear in the record exactly how many, were not rehired. It's unclear how many didn't apply, who didn't go through that process. It's unclear how many were washed out. What does the evidence show about gap in time? You're saying what they knew and didn't know. Would they, from the date that they were told that they'd have to reapply until they were accepted after reapplying, what's the time frame there? I mean, just a couple days passed and they were rehired, and that's to the extent it impeded in any way union activity, it lasted for two days? Your Honor, it was a couple days for most of the employees. Apparently, there was one employee, I believe, who was on leave at the time and had a lot of difficulty getting rehired in a timely manner and had to wait for an HSS person to be on the premises to accept her application. But for most of the housekeeping staff, it was very quick. What should I think of when I look at the fact that whatever kind of discouragement might have existed, it was very brief? Well, Your Honor, again, that's assuming that the employees would have known that there was a difference, that they could still unionize with both employers. They could have petitioned to negotiate with just HSS, but then they would have had to only petition for the housekeepers who had been subcontracted, because otherwise under the board's joint employer law, if they petitioned for the initial unit, which was larger and included some more employees besides the subcontracted housekeepers, they would need the permission of both entities to include those other employees who were not employed by HSS in the unit. When I asked about the law, I guess what I would like some help on is to the extent discouragement is what we're looking at, is there circuit law or board law that temporary discouragement, which proves to be without foundation, is not enough, that you need an actual impact of some sort beyond what we're talking of here? Now, you gave me an answer that you probably want to give me again, but is there anything beyond what you've just told me? No, Your Honor. I'm going to give you the same answer that I gave you before, which is that the reason there's no discussion of encouragement or discouragement in recent board cases is because this isn't a separate factor. What the board looks at is whether there was an adverse action taken, and firing employees and telling them they need to reapply for their jobs, including many of them not being rehired, is an adverse action sufficient? But what I'm saying is it's not whether factually actual discouragement occurred, but is it, in looking at it objectively, not subjectively what actions occurred, if whatever the adverse action was that could have led some people to be discouraged proves, in very short order, not to be adverse? It seems like that's relevant. Well, Your Honor, the board, that's not what the board was presented with here. It wasn't presented. Well, they did have the facts. It was only two days before these people were rehired. That's true, Your Honor, but there's no evidence that, but some of them weren't rehired. So if every single employee were rehired and that were clear from the very beginning, there was no gap in employment for any of them, and it was clear afterwards that the employees were able to continue unionizing without any break, that might be a different case from what we have right here. I can't speculate as to what the board would say in those circumstances, but here what we have is that some employees were not actually rehired. The employees were told that they'd need to reapply. They had to fill out forms and send them in. Was there any evidence, any of those that were not rehired, that that was a result of the drug test or whatever the pre-employment requirements were? I believe that of all, there's no evidence that I know of in the record about employees who didn't apply for their jobs, whether there are any employees who didn't apply at all. Of the employees who did apply, I believe there was only one employee that either Remington or HSS said they did not want reemployed for reasons other than drug testing or the immigration issues. So for all of the other employees who were not rehired, it would have been for drug testing or immigration issues. If the court has no further questions, I'm running out of time, and I request that you enforce the board's order in full. Thank you very much. Okay, Mr. Terrell, back to you. Yes, sir. Animus in the air is not enough to overcome the Supreme Court's clear statement that the statute is clear. There must be proof of discrimination, and you must prove actual discouragement. It's the American Shipbuilders v. NLRB case. In a case like this where you have only a suspicion of activity, union activity, no evidence of direct knowledge, and in addition you have a clear, strong evidence of a legitimate business need to re-outsource the operation, we respectfully submit that animus can't even be found. But you still have to show discouragement, and that just didn't happen. Motivation by the employer to discourage enough, isn't proof of that enough? I don't believe so, Your Honor, in light of American Shipbuilding and in light of the very wording of 8A3. The Supreme Court was clear you have to prove both discrimination and that there was actual discouragement of union membership. Do you think this would be a sea change? I don't think so. I mean, the Supreme Court law on this point, it's a very straightforward point. I understand, of course, the methodology of proving animus under right line. That's not really changing that law. But that law did not change the fact that the statute specifically requires, as the Supreme Court has said, both elements. There must be proof of discouragement, and you have to look at the facts commonsensically here. There was no significant break. The employees came to work that day. They were told, I think, the day before, tomorrow you'll be working for HSS. They filled out the applications. They went right to work. There was no break. A hotel is a 24-7 operation, and they had rooms to clean. I think thereafter, over a period of a week, as applications were processed, that is when HSS, for its independent reasons regarding screening, eliminated or didn't hire or let go several of those employees. Mr. Terrell, it seems to me your strongest sort of factual, the strongest factual component of this case on your side, is that the company had a terrible problem with this hotel, and it hadn't been fixed after six or seven months of this new ownership, and something needed to be done. I mean, I guess some commentary about losing the flag, I think, that they would no longer have that brand that they could use if they couldn't straighten this out. But on the other side, the board has come up with factual findings that we have to deal with, that there are other explanations. And so what you're really asking us to do—I mean, I've simplified it into one matter, and you're obviously raising many more things than that— to take care of this housekeeping problem they had. There are other motivations. There was knowledge of union activity, whether you agree that there was or not. There were facts there that we need to say is there some evidence to support them. Do you have some sort of global answer to all of that for me to keep me on track from your viewpoint? It's a balancing, Your Honor. Again, there was no proof. The judge did not make a finding of actual knowledge, just a suspicion. The knowledge that there was apparently a union organizer doing something in the hotel. But then opposite that, you have the strong evidence that the company had a serious problem that they had to deal with. And then at the end of the day, was there any discouragement of union membership? The facts are loud and clear that the union kept filing its petition and its support group. It just didn't happen. All right. I'm out of time. Thank you, Your Honor. Thank you, gentlemen. We have your case. And the panel will take about a ten-minute break before we take up the next case.